**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TERESA M. HOUSE, on behalf of herself, and all those similarly situated, known and unknown, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | **JURY DEMANDED** |
| ST. ANTHONY HOSPITAL, INC., an Illinois corporation, GUY A. MEDAGLIA, individually, and BOB ENKEMA, individually, | ) ) ) ) | Collective and Class Action Complaint |
| Defendants. | ) ) | |

## COMPLAINT

NOW COMES the Plaintiff, Teresa M. House ("House"), individually, and on behalf of herself and all other Plaintiffs similarly situated, known and unknown, by undersigned counsel, and complains against Defendants St. Anthony Hospital, Inc. ("SAH"), Guy A. Medaglia, in his individual capacity ("Medaglia"), and Bob Enkema, in his individual capacity ("Enkema") (and collectively, the "Defendants") as follows:

### NATURE OF THE CLAIMS

1.      House brings this Complaint on behalf of herself and all others similarly situated to recover unpaid overtime wages pursuant to the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* ("FLSA")*,* the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL"), and the City of Chicago Minimum Wage and Paid Sick Leave Ordinance ("Ordinance"). House also brings this action on behalf of herself for race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") and for sex discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), part of the FLSA.

2.     House and the putative collective and class wage and hour members were and/or are Jr. Financial Analysts, Financial Analysts, Sr. Financial Analysts (at times, collectively referred to as "Analysts") or some similarly titled position employed by SAH in its Finance Department.

3.     Defendants unlawfully misclassified Analysts as exempt and did not pay them overtime wages for hours worked in excess of forty per workweek.

4.     Defendants have engaged and continue to engage in this unlawful conduct pursuant to a policy, plan, or practice of minimizing labor costs and denying employees compensation by failing to pay Analysts overtime wages.

5.     Defendants are aware or should have been aware that the FLSA, the IMWL, and the Ordinance requires it to pay Analysts overtime wages for all hours worked in excess of 40 per workweek.  Indeed, Defendants were aware that the primary duties of the Analysts did not satisfy any of the overtime exemptions recognized by the FLSA, the IMWL, or the Ordinance; Defendants were aware that Analysts worked far in excess of 40 hours per workweek; and Defendants maintained and exercised the discretion to reduce the Analysts' compensation as a result of their hours worked - a hallmark of a non-exempt employee.

6.     House seeks unpaid overtime wages, pre- and post-judgment interest, punitive damages, injunctive and declaratory relief against Defendants' unlawful actions, and attorneys' fees and costs pursuant to the FLSA, the IMWL, and the Ordinance on behalf of herself and all other similarly situated Analysts.

7.     House brings Count IV under Section 1981 for race discrimination in the form of her May 26, 2020 termination.

8.     House brings Count V under Section 1981 for race discrimination in the form of unequal wages

9.     House brings Count VI under the EPA for discrimination in compensation.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over House's FLSA overtime claim, her Section

1981 race discrimination claims, and her EPA claim pursuant to 28 U.S.C. § 1331, 29 U.S.C. §

216(b) and 28 U.S.C. § 1343.  This Court has supplemental jurisdiction over House's IMWL and

Ordinance claims pursuant to 28 U.S.C. § 1367.

11.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§

2201 and 2202.

12.     Venue and personal jurisdiction are proper in this Court pursuant to 28 U.S.C. §

1391(b)(1) and (2) because Defendants conduct business in the Northern District of Illinois, the

conduct complained of occurred within this district, and, on information and belief, Medaglia and

Enkema reside within this district.

## THE PARTIES

**Plaintiff**

13.     House is a Black female and a resident of Chicago, Cook County,

Illinois.

14.     House was employed by SAH from 1998 through May 26, 2020, when SAH

terminated her employment at age 47.

15.     House was employed as an "Analyst" in SAH's Finance Department from

on or about 2006 until SAH terminated her employment on May 26, 2020.

16.     At all relevant times, House has been an employee of the Defendants within the

meaning of the FLSA, the IMWL, and the Ordinance.

17.     House regularly worked in excess of 40 hours per workweek and was not

compensated at the required overtime rate.

18. House has consented to be a party to the FLSA claims in the action pursuant to 29 U.S.C. §216(b). Her written consent is attached hereto as **Exhibit A**.

**Defendants**

**SAH**

19. SAH is a not-for-profit corporation, organized and operating under the laws of the State of Illinois, in the business of providing hospital services. Its principal place of business is 2875 W. 19th Street, Chicago, Illinois 60623.

20. SAH is an enterprise engaged in interstate commerce with gross sales in excess of $500,000.00. SAH is an "employer" as that term is used in the FLSA, the IMWL, the Ordinance, Section 1981, and the EPA, and at all times House was SAH's "employee" as that term is used in the FLSA, the IMWL, the Ordinance, Section 1981, and the EPA.

**Medaglia**

21. Since in or about 2010, Medaglia has been SAH's President and Chief Executive Officer. Medaglia is SAH's registered agent for service of process.

22. Medaglia is involved in the day-to-day business operations of SAH.

23. Medaglia hires and fires SAH employees, directs and supervises the work of SAH employees, signs on SAH's checking accounts, and makes decision regarding employee compensation and capital expenditures.

24. Medaglia was House's "employer" as that term is defined by the FLSA, 29 U.S.C. § 203(d), by the IMWL, 820 ILCS 105/3©, and by the Ordinance.

25. House was Medaglia's "employee" as that term is defined by the FLSA, 29 U.S.C. § 203(e)(1), by the IMWL, 820 ILCS 105/3(d), and by the Ordinance.

**Enkema**

26.     Enkema became SAH's Executive Vice President and Chief Financial Officer in 2019.

27.     Enkema is involved in the day-to-day business operations of SAH.

28.     Enkema hires and fires SAH employees, directs and supervises the work of SAH employees, signs on SAH's checking accounts, and makes decision regarding employee compensation and capital expenditures.

29.     Enkema was House's "employer" as that term is defined by the FLSA, 29 U.S.C. § 203(d), by the IMWL, 820 ILCS 105/3©, and by the Ordinance.

30.     House was Medaglia's "employee" as that term is defined by  the FLSA, 29 U.S.C. § 203(e)(1), by the IMWL, 820 ILCS 105/3(d), and by the Ordinance.

## COLLECTIVE ACTION ALLEGATIONS

31.     House brings Count I against Defendants as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of herself and other similarly situated individuals, which shall include the **"FLSA Collective"** defined as:

> All individuals who were employed by SAH as a Jr. Financial Analyst, Financial Analyst, Sr. Financial Analyst, or similarly titled positions on or after the date that is three years before the filing of this Complaint.

32.     As part of its regular business practice, Defendants have intentionally, willfully, and repeatedly harmed the FLSA Collective by engaging in a pattern, practice, and/or policy of violating the FLSA.

33.     The FLSA Collective would benefit from the issuance of a Court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit.  Those similarly

situated employees are known to Defendants and are readily identifiable and can be located

through its records, which Defendants are required to create and maintain pursuant to the FLSA,

the IMWL, and the Ordinance.  Those similarly situated employees should be notified of and

allowed to opt into this action pursuant to 29 U.S.C. § 216(b).

### RULE 23 CLASS ACTION ALLEGATIONS

34.     House brings the claims set forth in Count II, alleging violations of the IMWL's

overtime provisions, as a Rule 23 Class Action on behalf of herself and other similarly situated

individuals which shall include the **"IMWL Overtime Class"** defined as:

> All individuals who were employed by SAH as a Jr. Financial Analyst, Financial
> Analyst, Sr. Financial Analyst, or in similarly titled positions on or after the date
> that is three years before the filing of this Complaint.

35.     House brings the claims set forth in Count III alleging violations of the

Ordinance overtime provisions, as a Rule 23 Class Action on behalf of herself and other similarly

situated individuals which shall include the **"Ordinance Overtime Class"** defined as:

> All individuals who were employed by SAH as a Jr. Financial Analyst, Financial
> Analyst, Sr. Financial Analyst, or in similarly titled positions on or after the date
> that is three years before the filing of this Complaint.

36.     On information and belief, the Rule 23 **IMWL Overtime Class** and **Ordinance**

**Overtime Class** described above are so numerous and geographically dispersed that joinder of

all members is impractical, and the disposition of their claims in a class action will provide

substantial benefits to both the parties and the Court.   On information and belief, at least 40 Jr.

Financial Analysts, Financial Analysts, Sr. Financial Analysts, or similarly titled positions

worked over 40 hours per workweek without being paid overtime premium pay or all straight

time pay due them on or after the date that is three years before the filing of this Complaint.

6

37.     Common questions of law and fact predominate over individual issues affecting only individual class members.  The common questions of law and fact include, among others, the following:

a.      Whether Defendants denied House and the putative class members overtime premium pay for hours worked in excess of 40 in a workweek in violation of the IMWL and the Ordinance.

b.      Whether Defendants improperly classified House and the putative class members as exempt under the IMWL and the Ordinance.

c.      Whether Defendants failed to comply with the IMWL the supporting Illinois Department of Labor regulations by failing to maintain true and accurate records of House's and the putative class members' hours worked each day in each work week

38.     House will fairly and adequately protect the interests of all class members.  Her claims are typical of the claims of all class members.  Her interests in obtaining monetary relief for Defendants' violations of the class members' rights is consistent with and not antagonistic to those of any person within the classes.

39.     House has retained counsel competent and experienced in complex and class action litigation.

40.     A class action is superior to other methods for the fair and efficient adjudication of the class wage and hour controversy alleged in this Complaint.  Class action treatment will permit a large number of similarly situated persons to prosecute their relatively modest, common claims in a single forum simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individual actions would require.

41.     This Court is not likely to encounter difficulties that would preclude it from maintaining this case as a class action, and no superior alternative exists for the fair and efficient

adjudication of this controversy. Individualized litigation also would present the potential for inconsistent or contradictory judgments.

## FACTUAL ALLEGATIONS

42.     House began employment with SAH in August 1998. She was employed continuously by SAH until May 26, 2020, when SAH terminated her employment.

43.     At all times, House worked in SAH's Finance Department. Her first job was that of a Payroll Clerk in the "Payroll" group within the Finance Department. In 2005, SAH moved House to the "Accounting" group within the Finance Department. In 2006, SAH moved House to the "Decision Support" group within the Finance Department, where she worked continuously up to her May 2020 termination.

### House's performance meets or exceeds SAH's legitimate expectations and she receives numerous promotions and merit increases

44.     Between her 1998 hire and her May 2020 termination, House's employment performance at all times met or exceeded SAH's expectations. House received numerous promotions and merit increases.

45.     In January 2004, SAH  promoted House from Payroll Clerk to Payroll Specialist, paid her on an hourly basis, and classified her as non-exempt from the overtime requirements of the FLSA and the IMWL.

46.     In 2005, SAH promoted House to Accounting Assistant, paid her on an hourly basis, and  and classified her as non-exempt from the overtime requirements of the FLSA and the IMWL.

### SAH misclassifies House as overtime exempt once she becomes an "Analyst"

47.     On or about December 17, 2006, SAH promoted House to Jr. Financial Analyst

8

and she began working in the Decision Support group within the Finance Department. At this time, SAH classified House as exempt from the overtime requirements of the FLSA and the IMWL. SAH designated House's hourly rate at $20.83 per hour.

48.     On or about August 29, 2008, while House was still a Jr. Financial Analyst, SAH announced that SAH was raising her hourly pay rate to $22.16.

49.     On or about March 2010, SAH promoted House to Financial Analyst and classified her as exempt from the overtime requirements of the FLSA and the IMWL. SAH designated an hourly pay rate for House.

50.     On or about September 8, 2010, while House was still a Financial Analyst, SAH announced that it was raising House's hourly pay rate to $26.95.

51.     On or about October 2, 2010, while House was still a Financial Analyst, SAH raised her hourly pay rate to $29.35.

52.     On or about September 2, 2011, while House was still a Financial Analyst, SAH raised House's hourly pay rate to $30.34.

53.     In 2011 or 2012, SAH promoted House to Senior Financial Analyst. SAH classified House as exempt from the overtime requirements of the FLSA and the IMWL. SAH paid House on an hourly basis from the time of her promotion to Senior Financial Analyst up through her May 26, 2020 termination. At the time of her termination, House's hourly pay rate was $40.72.

54.     While House and other Analysts were employed as Jr. Financial Analysts, as Financial Analysts, or as Senior Financial Analysts, SAH paid them bi-weekly, every other Friday.

55.     While House and other Analysts were employed as Jr. Financial Analysts, as Financial Analysts, or as Senior Financial Analysts, SAH paid them based on an eight-hour workday.

9

56.     Before House became a Jr. Financial Analyst, SAH required her to punch in at the beginning of her workday and punch out at the end of the work day.  House punched in and out using a biometric-based time clock that required House to scan her palm print.  Subsequently, SAH altered the process to a biometric based time clock that required House to punch in and out by scanning her fingerprint.  SAH automatically deducted thirty (30) minutes for lunch from House's workday.

### SAH fails to maintain true and accurate records of House's hours worked each day in each work week

57.     In or about 2016, SAH no longer required House to punch in at the beginning and the end of her workday.

58.     Instead, SAH only required House to punch in once a day, some time after arriving at work.  SAH automatically deducted thirty (30) minutes for lunch from House's workday.

59.     In or about 2016, SAH likewise only required other Analysts to punch in once a day, some time after arriving at work.  SAH automatically deducted thirty (30) minutes for lunch from the Analysts' workday.

60.     SAH paid House based on an eight-hour workday.  Therefore, SAH did not require House to clock in at the time she commenced working at the beginning of the workday.  As a result, House sometimes clocked in after she had already begun work.

61.     SAH likewise paid other Analysts based on an eight-hour workday.  Therefore, SAH did not require other Analysts to clock in at the time they commenced working at the beginning of the workday.  As a result, other Analysts sometimes clocked in after they had already begun work.

62.     SAH failed to make and maintain true and accurate records of House's and other Analysts' hours worked each day in each work week while they were employed as Jr. Financial Analysts,  Financial Analysts, or Senior Financial Analysts.

63.     In the three years previous to the filing of this Complaint, House's regular workday was defined as from 6:30 a.m. to 3:00 p.m., Monday through Friday.  Some Analysts' regular workday was defined as 8:30 a.m. to 5:00 p.m., Monday through Friday, including, for example, Senior Financial Analyst Brett Burke.

64.     However, House regularly stayed one to three hours late.  On days that she could not stay late in the office, she regularly logged in remotely and worked from home.  SAH's annual budget season was particularly demanding and House and other Analyst's overtime hours were particularly high when SAH was going through its annual budget process due to the increase in reports they needed to generate on behalf of SAH management like Medaglia and due to multiple requests from departments and management to enter new numbers in the budget drafts.

65.     In the three years previous to the filing of this Complaint, in one or more weeks during a pay period, House worked more than 40 hours in at least one workweek.  An example of months during which House  worked more than 40 hours in at least one workweek is August, September, and October of 2017, January through June of 2018, and February and March of 2019.

66.     During her employment as an Analyst, SAH did not pay House for hours that she worked in excess of 40 in a workweek.

67.     During her employment as an Analyst, SAH did not pay House overtime at a rate of one and one-half times her regular rate of pay when she worked in excess of 40 hours in a workweek.

68.     In the three years previous to the filing of this Complaint, in one or more weeks during a pay period, other Analysts worked more than 40 hours in at least one workweek.

69.     In the three years previous to the filing of this Complaint, SAH did not pay other Analysts for hours that they worked in excess of 40 in a workweek.

11

70.     In the three years previous to the filing of this Complaint, in one or more weeks, SAH did not pay other Analysts overtime at a rate of one and one-half times their regular rate of pay when they worked in excess of 40 hours in a workweek.

71.     While employed as an Analyst, House regularly worked through her lunch period but nonetheless was docked thirty (30) minutes of pay despite performing work during these 30 minutes. An example of a workweek in which House worked through her lunch period is the week of February 19, 2018.

72.     In the three years previous to the filing of this Complaint, in one or more weeks, other Analysts worked through their meal period but nonetheless were docked thirty (30) minutes of pay despite performing work during these 30 minutes.

### House's primary job duties

73.     During the time House worked in each of her Analyst positions in the Decision Support group, SAH used electronic health record software systems known as McKesson Paragon and McKesson Horizon Performance System in its business.

74.     The McKesson Paragon product is a hospital information and electronic health record system that allows hospitals like SAH to capture clinical information and financial information. For example, the Paragon product captures the number of patients admitted to SAH and the revenue generated by the admissions.

75.     The McKesson Horizon Performance System is a healthcare information system that allows hospitals like SAH to monitor and analyze business performance trends across its organization. The system software allows key performance indicator data to be input and "dashboards" to be generated on a variety of topics. Reporting tools in the McKesson Horizon

Performance System allow for the generation of reports to SAH physicians, executives, and administrators of clinical, operational, and financial key performance indicators. This data allows SAH physicians, executives, and administrators to make informed, proactive decisions regarding SAH's business. SAH refers to the McKesson Horizon Performance System as "HPM." SAH also refers to the McKesson Horizon Performance System as "HBI," that is, Horizon Business Insight.

76.     By way of example, the McKesson Horizon Performance System allows key performance indicator data to be stored in the system regarding physician performance, *e.g.*, revenue per physician and reimbursements per physician. The McKesson Horizon Performance System allows this information to be pulled, integrated into one or more documents, and generated in the form of a report to SAH stakeholders. A physician performance report provides SAH's President and Chief Executive Officer, Guy Medaglia, and SAH's Executive Vice President and Chief Financial Officer, Bob Enkema, with insights into how each SAH physician and specialty is performing in terms of number of cases, revenue per case, utilization cost per case, and bonuses and penalties incurred per physician.

77.     House's primary duties as an Analyst (whether she held the title of Jr. Financial Analyst, Financial Analyst, or Senior Financial Analyst) involved data entry and report generation using the data.

78.     For example, House would: verify that the patient revenue reflected in the Paragon system matched the patient revenue reflected in the Horizon Performance System; run patient revenue reports; update key performance indicator information data; input SAH budget data to the Horizon Performance System; and generate reports requested by SAH physicians and management using the data in the McKesson Paragon and the McKesson Horizon Performance System. By way

of example, sometimes an SAH department would tell House that it wanted to know how many babies were delivered at SAH during a certain time period, and of the deliveries, how many were vaginal and how many were by C-section. By logging into the source data residing in the McKesson Paragon and the McKesson Horizon Performance System, House would generate a report and email it to the requesting department.

79.     The primary duties of other Analysts involved essentially identical function and tasks as those performed by House,  for which a majority to their time was spent engaged in tasks that were not consistent with any recognized exemption from the general requirement to pay overtime wages.

80.     House's duties as an Analyst did not require advanced knowledge or a course of specialized instruction.

81.     House's duties as an Analyst did not require her to, and she did not, compare and evaluate possible courses of conduct in performing her duties.  To the contrary, and as stated in her performance appraisals, she collected statistical data, maintained the data, and prepared reports for SAH's budget and for stakeholders like doctors and management.

82.     House's duties as an Analyst did not require her to act or make a decision after considering various possibilities.  Rather, SAH directed House as to what reports it wanted and the scope of the report.

83.     While employed as an Analyst, House continued performing payroll duties like those she performed while classified by SAH as a non-exempt Payroll Clerk.  For example, from on or around April 2019 onward, House routinely reviewed employee times sheets for accuracy and issued manual paychecks in connection with SAH's bi-weekly payroll.  Mr. Jamie Mack, SAH's Vice

14

President and Controller, who was House's supervisor ("Mack"), directed House to assist with payroll. Mack reports to Enkema. Enkema knew that House was performing payroll duties when she was a Senior Financial Analyst.

84. House did not supervise anyone when she was employed by SAH as an Analyst and she did not hire, fire, or discipline employees.

85. Nor did other Analysts supervise anyone and nor did they hire, fire, or discipline employees.

86. House did not oversee or direct any of SAH's work divisions or departments.

87. Nor did other Analysts oversee or direct any of SAH's work divisions or departments.

88. House did not have the authority to interpret or implement management policies or operating practices.

89. Nor did the other Analysts have the authority to interpret or implement management policies or operating practices.

90. The work performed by House as an Analyst does not directly relate to the management or general business operations of SAH or its customers. Rather, her work falls on the production side of the staff versus production dichotomy found in 29 C.F.R. § 541.202(a).

91. Nor did the work performed by the other Analysts directly relate to the management or general business operations of SAH or its customers. Rather, their work falls on the production side of the staff versus production dichotomy found in 29 C.F.R. § 541.202(a).

92. On or about March 16, 2020, House and other Analysts began working remotely due to the COVID-19 pandemic. House's regularly defined work schedule remained Monday through

15

Friday, 6:30 a.m. to 3:00 p.m.  However, House continued to work overtime, sometimes starting

work before 6:30 a.m. and/or working beyond 3:00 p.m.

93.    On April 22, 2020, House and other employees working remotely received an email

from Medaglia advising that, beginning April 24, 2020, SAH was implementing a labor pool for all

non-clinical staff requiring those working remotely to work two shifts "onsite in the labor pool" in

addition to their regular duties or take PTO (paid time off).  The email stated:

> You will be given the option to work both shifts assigned to you in this pool or use
> PTO.  For example, if you are a full-time employee working 40 hours a week from
> home, you would be required to work two shifts in the labor pool or take 16 hours of
> PTO.  If you run out of PTO or are unable to fulfill the assigned labor pool shifts for
> any reason, you will be furloughed until the pandemic has ended.

A copy of the email is attached hereto as **Exhibit B**.

94.    House opted out of taking labor pool shifts because her health conditions, her

son's health conditions, and her parents' ages and health conditions made them more susceptible to

contracting COVID-19 or being seriously impacted by COVID-19.  House told SAH that this is why

she was opting out of the labor pool  shifts. House has serious health conditions that compromise

her immune system, including hypertension and chronic asthma for which she takes prescribed

Chronic Obstructive Pulmonary Disease ("COPD") medication.  House's son, who lives with her,

is autistic.  He also has a serious health condition that compromises his immune system -  diabetes.

 House's mother and stepfather are ages 75 and 76, respectively.    Her mother has diabetes,

hypertension, asthma, and other medical conditions.  Her stepfather has kidney disease, hypertension,

and a heart condition.  The Finance Department is not in the hospital, but is across the street from

the hospital.  Working a labor pool shift would have required House to work within the hospital,

thereby increasing her likelihood of contracting COVID-19.

95.     Upon House opting out of the labor pool shifts, SAH reduced House's regular work schedule to three (3) days per week for a total of 24 hours per week.  Beginning the week of Monday, April 27, House worked Monday, Tuesday, and Wednesday.  She was forced to use the remaining two business days as PTO days.   This was House's work schedule up through the date SAH terminated her, May 26, 2020.

96.     By paying House only for the hours she worked and forcing her to take PTO time, SAH treated House as being non-exempt from the overtime requirements of the FLSA, the IMWL, and the Ordinance.

### SAH's violations of Section 1981 based on House's race, Black

97.     Beginning in at least 2017 and continuing to May 26, 2020 (the date of House's termination by SAH), SAH engaged in discriminatory practices against House and other Black employees regarding the terms and conditions of their employment on the basis of race, including, but not limited to, denying training and information to House that SAH provided to non-Black employees, paying White employees more than House, and terminating House while continuing to employ non-Black employees.

98.     In or about December 2017, SAH hired Brett Burke ("Burke"), a White male, as a Senior Financial Analyst in the Decision Support group within the Finance Department.

99.     At the time SAH hired Burke, House had been employed by SAH for over 19 years, and had been employed as a Senior Financial Analyst in the Decision Support group within the Finance Department for approximately five (5) years.

100.    In addition to the value House brought to SAH in performing the duties of a Senior Financial Analyst, she brought added value to SAH in the form of the payroll duties she performed

in addition to her Senior Financial Analyst duties. House was able to perform these payroll duties because of her prior employment in SAH's Payroll group within the Finance Department.

101.    Burke never had worked in SAH's Payroll group or in SAH's Accounting group. His first job with SAH was when he was hired by SAH as a Senior Financial Analyst

102.    House's overall performance was superior to Burke's overall performance.

103.    For example, House's customer service was superior to that of Burke's and so, too, was her attendance, punctuality, and productivity.

104.    Burke often arrived late to work and spent unproductive time away from his workstation simply walking the halls of the building in which the Finance Department was located. House frequently saw Burke with his feet up on his desk playing with his cell phone.

105.    Mack, Burke's supervisor, told House that Burke was not working on anything and that Mack brought these observations to Enkema.

106.    On information and belief, Burke was not complying with SAH's rule that Analysts punch in once a day sometime after arriving to work. On information and belief, Burke was not working his full shift and Mack was manually adding Burke's punch to the time system.

### SAH's violations of the EPA

107.    Despite House's longer tenure at SAH, more years of experience as an Analyst, the added value she brought to her Senior Financial Analyst position as a result of her experience in the Payroll and Accounting groups of SAH's Finance Department, and her superior work performance, SAH paid Burke more money than it paid House. On information and belief, SAH was paying Burke approximately two dollars ($2.00) more per hour than it paid House at the time of her May 2020 termination.

108.    Despite House's longer tenure at SAH, more years of experience as an Analyst, the added value she brought to her Senior Financial Analyst position as a result of her experience in the Payroll and Accounting groups of SAH's Finance Department, and her superior work performance, as compared to Burke, SAH fired House on May 2020 but continued to employ Burke.

109.    In or about April 2019, SAH hired Mandy Wang ("Wang"), an Asian female, as a Financial Analyst in the Decision Support group within the Finance Department.

110.    Wang never had worked in SAH's Payroll or Accounting groups.  Her first job with SAH was when she was hired as a Financial Analyst.

111.    On information and belief, House's overall performance was superior to Wang's overall performance.

112.    Despite House's longer tenure at SAH, more years of experience as an Analyst, and the added value she brought to her Senior Financial Analyst position as a result of her experience in the Payroll and Accounting groups of SAH's Finance Department, as compared to Wang, SAH fired House on May 2020 but continued to employ Wang.

113.    Enkema provided extensive training to Burke and to Wang on a database that he had created or was creating related to SAH financial information, to the exclusion of House.

114.    Additionally, House and other Black employees observed that Enkema rarely spoke to House or to other Black employees within the Finance Department, but spoke extensively with non-Black employees.

115.    Shortly after Enkema's 2019 appointment as SAH's Executive Vice President and Chief Financial Officer, Marcia Moore ("Moore"), a Black female Director of a Managed Care group within the Finance Department, hired Brandon Taylor ("Taylor"), a Black male, as a

Credential Specialist. Moore hired Taylor to replace an Hispanic female Credential Specialist named Rosa Kroh, who had resigned her employment. Approximately two months after Moore hired Taylor, Enkema fired Moore. A few weeks later, Enkema fired Taylor and told Taylor that his job duties were being outsourced.

116.    In reality, SAH did not outsource Taylor's job duties.

117.    Rather, SAH hired a White female named Cynthia Reynolds to perform Taylor's job duties.

118.    On May 26, 2020, Enkema and Maria Garcia ("Garcia"), Director of Benefits and Compensation (female, Hispanic), telephoned House. Enkema told House that her position with SAH was being eliminated due to SAH's financial difficulties and need to reduce its overhead.

119.    Burke opted into the labor pool shifts as addressed in Medaglia's April 22, 2020 email to SAH non-clinical staff. The labor pool work Burke performed was doing inventory in Central Supply. However, SAH did not require Burke to work as many labor pool hours as required in Medaglia's April 22 email. Rather, Burke performed labor pool work during his regularly scheduled work hours of 8 hours per day. Further, the majority of work Burke performed each workweek he performed remotely from home. SAH did not furlough Wang.

120.    Wang told House that Wang was afraid to work in the hospital due to the COVID-19 pandemic and that she had no PTO available. Wang thus opted into the labor pool. However, SAH did not require Wang to work in the labor pool. Nonetheless, SAH continued paying Wang full-time wages for her Financial Analyst work. SAH did not furlough Wang,

### COUNT I - Violation of FLSA (FLSA Collective)
Against SAH, Medaglia, and Enkema
Jury demanded

121.    House incorporates all preceding paragraphs as if fully stated herein.

122.     Defendants' conduct violates §207(a)(1) of the FLSA, and Defendants' unlawful conduct is widespread, repetitious, and consistent, affecting all Analysts, or those employees with similar titles.

123.     Pursuant to 29 C.F.R. § 786.18, breaks for a period of 20 minutes or less must be counted as compensable hours worked under the FLSA.

124.     Defendants violated the FLSA by automatically deducting 30 minutes from House's and the FLSA Collective's workday for a meal period during which they worked.

125.      Defendants' conduct is willful and in bad faith, and has caused significant damages to House and those similarly situated.

126.     Notice of this action should be sent to the FLSA Collective. There are numerous similarly situated current and former employees of Defendants who have been denied appropriate compensation in violation of the FLSA who would benefit from the issuance of a Court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. These similarly situated employees are known to Defendants and are readily identifiable through Defendants' records.

**Prayer for Relief**

House and all those similarly situated pray that this Court enter judgment in their favor and against Defendants, and further:

a.     Certify this case as a collective action pursuant to 29 U.S.C. § 216(b);

b.     Order Defendants to file with this Court and furnish to House's counsel a list of all members of the FLSA Collective;

c.     Authorize House's counsel to issue notice at the earliest possible time to all members of the FLSA Collective Members, informing them that this action has been filed, of the nature of the action, and of their right to opt into this lawsuit;

d.     Declare and find that the Defendants willfully violated the overtime provisions of the FLSA;

e.     Order Defendants to pay the full amount of wages due House and all members of FLSA Collective for work in excess of forty (40) hours in a workweek, at one and

one-half times their regular rate of pay, and an amount equal to the unpaid wages for liquidated damages and pre-judgment and post-judgment interest on the unpaid wages;

f.      Award reasonable attorneys' fees and costs incurred in prosecuting this claim, pursuant to 29 U.S.C. §216 and/or other applicable laws; and

g.      Award such other relief as this Court deems just and proper

### Count II - Violation of the IMWL - (IMWL Overtime Class)
Against SAH, Medaglia, and Enkema
Jury demanded

127.    House incorporates all preceding paragraphs as if fully stated herein.

128.    Defendants' conduct violates the overtime and record-keeping requirements of §4a.(1) of the IMWL, 820 ILCS 105/4a, and its regulations, and Defendants' unlawful conduct is widespread, repetitious, and consistent, affecting the IMWL Overtime Class.

129.     Defendants' conduct is willful, repeated, and with reckless disregard of the overtime requirements of the IMWL, and in bad faith, and has caused significant damages to House and the IMWL Overtime Class.

### Prayer for Relief

House and all those similarly situated pray that this Court enter judgment in their favor and against Defendants, and further:

a.      Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.      Appoint House as the representative of the IMWL Overtime Class;

c.      Appoint the undersigned counsel as class counsel;

d.      Declare that the action complained of herein violate 820 ILCS 105/4a;

e.      Award House and putative class members unpaid wages due as provided by the IMWL;

f.      Award pre-judgment interest on the back wages in accordance with 815 ILCS 205/2;

g.   Award penalties in the amount of 2% on all unpaid wages for each month the unpaid wages remain delinquent, pursuant to 820 ILCS 105/12(a);

h.   Award reasonable attorneys' fees and costs in this action as provided by the IMWL;

i.   Award such other relief as this Court deems just and proper.

### Count III - Violation of the Ordinance - (Ordinance Overtime Class)
Against SAH, Medaglia, and Enkema
Jury demanded

130.   House incorporates all preceding paragraphs as if fully stated herein.

131.   Defendants' conduct violates the Ordinance.

132.   Defendants' unlawful conduct is widespread, repetitious, and consistent, affecting all consultants, or those employees with similar titles.

133.    Defendants' conduct is willful, repeated, and with reckless disregard of the overtime requirements of the Ordinance, and in bad faith, and has caused significant damages to Davenport and those similarly situated.

### Prayer for Relief

House and all those similarly situated pray that this Court enter judgment in their favor and against Defendants, and further:

a.   Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ;

b.   Appoint House as the representative of the Ordinance Overtime Class;

c.   Appoint the undersigned counsel as class counsel;

d.   Declare that the action complained of herein violate Chicago Municipal Code § 1-24-040;

e.   Award House and putative class members unpaid wages due as provided by the Ordinance;

f.   Award pre-judgment interest on the back wages in accordance with Chicago Municipal Code § 1-24-110;

g.  Award penalties in the amount of three times the amount of all unpaid wages, pursuant to Chicago Municipal Code § 1-24-110;

h.  Award reasonable attorneys' fees and costs in this action as provided by the Ordinance;

i.  Award such other relief as this Court deems just and proper.

<u>**COUNT IV - Violation of Section 1981 based on wages**</u>
Against SAH
Jury demanded

134.  House incorporates all preceding paragraphs as if fully stated herein.

135.  Evidence of an employer's treatment of other members of House's protected class can provide evidence of discrimination

136.  This court arises under Section 1981 for SAH's discriminatory treatment in terms and conditions of employment that took the form of House being paid a lower hourly rate of pay as compared to Burke.

137.  Section 1981 provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (a).

138.  The statute defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981 (b).

139.  At all relevant times, the SAH person or persons who determined House's and Burke's respective hourly rates of pay knew that House is Black and that Burke is White.

140.  SAH paid House less than Burke for equal or better work in positions requiring

equal skill, effort, and responsibility, and performed under similar working conditions.

141. SAH's failure to pay House at an hourly rate equal or greater to that paid Burke, White, was a purposeful, racially discriminatory action caused centrally by House's race, Black, that affected House's terms and conditions of her contractual relationship with SAH.

142. As a direct and proximate result of SAH's actions, House suffered damages of a pecuniary and non-pecuniary nature, humiliation, and degradation.

143. SAH's conduct was willful and/or reckless, warranting the imposition of punitive damages.

### **Prayer for Relief**

House prays that this Court enter judgment in her favor and against SAH, and further:

a. Enjoin SAH from continuing or permitting future violations of Section 1981 for racial discrimination against House;

b. Award House back pay, interest, and other non-liquidated benefits flowing from SAH's discriminatory conduct as well as punitive damages;

c. Award reasonable attorneys' fees and costs in bringing this action;

d. Award such other relief as this Court deems just and proper.

### **COUNT V - Violation of Section 1981 based on termination**
Against SAH
Jury demanded

144. House incorporates all preceding paragraphs as if fully stated herein.

145. This court arises under Section 1981 for SAH's discriminatory treatment in terms and conditions of employment that took the form of House being terminated on May 26, 2020.

146. At all relevant times, the SAH person or persons who whether House would be terminated knew that House is Black and that Burke is White.

147. SAH's decision to terminate House was a purposeful, racially discriminatory action caused centrally by House's race, Black, that affected House's terms and conditions of her

contractual relationship with SAH.

148.     As a direct and proximate result of SAH's actions, House suffered damages of a pecuniary and non-pecuniary nature, humiliation, and degradation.

149.     SAH's conduct was willful and/or reckless, warranting the imposition of punitive damages.

## Prayer for Relief

House prays that this Court enter judgment in her favor and against SAH, and further:

a.     Enjoin SAH from continuing or permitting future violations of Section 1981 for racial discrimination against House;

b.     Award House reinstatement, back pay, interest, and other non-liquidated benefits flowing from SAH's discriminatory conduct as well as punitive damages;

c.     Award reasonable attorneys' fees and costs in bringing this action;

d.     Award such other relief as this Court deems just and proper.

## COUNT VI - Violation of the EPA
Against SAH
Jury demanded

150.     House incorporates all preceding paragraphs as if fully stated herein.

151.     This count arises under the EPA for SAH's discriminatory treatment in paying House a lower hourly rate of pay as compared to Burke.

152.     At all relevant times, the SAH person or persons who determined House's and Burke's respective hourly rates of pay knew that House's sex is female and that Burke's sex is male.

153.     House and Burke performed equal work in positions requiring equal skill, effort, and responsibility.

154.     House and Burke performed their jobs under similar working conditions.

155.     The hourly rate of pay disparity between House and Burke was not justified by a merit system.

156.    The hourly rate of pay disparity between House and Burke was not justified by a seniority system.

157.    The hourly rate of pay disparity between House and Burke was not justified by a system that measures earnings by the quantity or quality of production.

158.    The hourly rate of pay disparity between House and Burke was not justified by a differential based on any factor other than sex, adopted for a legitimate business reason.

159.    As a direct and proximate result of SAH's actions, House suffered damages of a pecuniary and non-pecuniary nature, humiliation, and degradation.

## Prayer for Relief

House prays that this Court enter judgment in her favor and against SAH, and further:

a.      Enjoin SAH from continuing or permitting future violations of the EPA against House;

b.      Award House back pay, interest, and other non-liquidated benefits flowing from SAH's discriminatory conduct as well as punitive damages;

c.      Award reasonable attorneys' fees and costs in bringing this action;

d.      Award such other relief as this Court deems just and proper.

Dated: July 29, 2020                    Respectfully submitted,

                                        TERESA M. HOUSE


                                         /s/ Margherita M. Albarello
                                         One of her attorneys

Margherita M. Albarello/ARDC. No.: 6187374
Jonathan R. Ksiazek/ARDC No.: 6296997
Di Monte & Lizak, LLC
216 W. Higgins Road
Park Ridge, IL 60068
P:  847.698.9600
F:  847.698.9624
E:  malbarello@dimontelaw.com
E:  Jksiazek@dimontelaw.com

ATTORNEYS FOR PLAINTIFF AND THE
PUTATIVE COLLECTIVE AND CLASS

27